UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

RITA FLYNN,                                                    No. 20-cv-9381

                                        Plaintiff,            **THIRD AMENDED
                                                              COMPLAINT_____**

                        -against-

MATTHEW BLOOMINGDALE, in
his individual and official capacities, and
JOHN A. SHIPLEY, in his individual and
official capacities, DONALD OLIVER, in
his individual and official capacities,
all officers of the NEW YORK STATE
DEPARTMENT OF CORRECTIONS                                     **JURY TRIAL DEMANDED**
AND COMMUNITY SUPERVISION,

                                        Defendants.

_____

       Plaintiff, Rita Flynn, by her attorney, Michael Ranis, Attorney at Law, as and for her

Complaint against defendants, alleges as follows:

### Nature of the Action and Preliminary Statement

       This is an action under §1983 of the Civil Rights Act of 1866 and to correct unlawful

activity in violation of the First and Fourteenth Amendments to the Constitution of the United

States.  In sum and substance, plaintiff Rita Flynn spoke out on a matter of public concern about

the threats to the public's safety posed by improper treatment of a sexual offenders in Orange

and Sullivan counties.  She did so by filing several public lawsuits.  Plaintiff Flynn claims that

defendants Matthew Bloomingdale,  John A. Shipley, and Donald Oliver then retaliated against

her and violated her constitutional rights by relying on manufactured misconduct, threatening her

with criminal prosecution at an arbitration hearing if she did not abandon her Parole Officer

position – and intentionally even mischaracterized and exaggerated the severity of the supposed

criminal charges.  Plaintiff asserts that this proposed exchange based on the threat of criminal

prosecution not only constitutes a criminal misdemeanor, but violates plaintiff's rights to free

speech and fair procedural due process.

This action is related to a prior lawsuit Flynn filed in federal Court, *Rita Flynn v. DOCCS*

*et. al.*, Civ. 7:17-cv-02864, and dismissed on April 30, 2018.

## Jury Demand

Plaintiff demands a trial by jury of her claims.

## The Parties

1.     At the time of the acts complained herein, plaintiff Rita Flynn ("Flynn")

was and is a resident of Chester, New York, County of Orange, New York.

2.     At the time of the events complained herein, plaintiff Rita Flynn ("Flynn")

was a Parole Officer ("PO") employed by defendant Department of Corrections and Community

Service ("DOCCS"), but DOCCS had suspended her employment.  Flynn's proposed termination

was the subject of an arbitration between her union and DOCCS.  Flynn had been employed as a

Parole Officer since the start of November 2016 - originally starting her employment with

DOCCS in 1979.  Before November 2016 -- and for a period of approximately eight years after

2008 -- DOCCS' employed Flynn as a Parole Officer working on Special Assignment working

with released sex offenders, as a provider of strict and intensive supervision in the Sexual

Offenders Management Unit ("SOMU"). Whether on Special Assignment in the SOMU or later

as a general Parole Officer at the time of the alleged violations, Flynn worked out of DOCCS'

offices in Westchester and Dutchess Counties, and the arbitration at issue occurred in Dutchess

County

3.      DOCCS is the agency of the State of New York that administers the State's prisons, and release of eligible parolees (including sex offenders) into the community at-large, and Flynn's former employer, as discussed above.

4.      Defendant Matthew Bloomingdale ("Bloomingdale") is the Associate Director HR 2 Labor Relations for DOCCS in the Area 2 and has ultimate responsibility for Labor matters in the geographical area where Flynn worked before Labor Relations discharged her.  As Director HR 2, Bloomingdale has the primary responsibility to direct and supervise all Labor and personnel matters concerning the discipline and supervision of employees for DOCCS in that geographical Area. As a manager and decision-maker for DOCCS, he is in regular communication with DOCCS' supervisors and state-wide and Regional administrators who determine and recommend such discipline, including the Deputy Commissioner of DOCCS, and other administrators with supervisory and personnel responsibilities.  As the top Labor Relations manager responsible the adjudication and defense of disciplinary actions by DOCCS in Area 2, he acted under color of state law in reviewing and implementing the discipline of plaintiff at issue in this case, as well as being the main representative of DOCCS at an arbitration to uphold the proposed discharge of plaintiff.

5.      Defendant John A. Shipley ("Shipley") is the statewide Director of Labor Relations for DOCCS and has ultimate responsibility for Labor matters for DOCCS, upon information and belief, in the entire State of New York.   As the Director, Shipley has the primary responsibility to direct and supervise all Labor and personnel matters concerning the discipline and supervision of employees for DOCCS throughout the state. As Director and a decision-maker for DOCCS in charge of its Labor Relations functions, he is in regular communication with DOCCS' supervisors and state-wide and Regional administrators who

determine and recommend such discipline, including the Deputy Commissioner of DOCCS, and other administrators with supervisory and personnel responsibilities.  As the top Labor Relations manager responsible the adjudication and defense of disciplinary actions by DOCCS, he acted under color of state law in reviewing and implementing the discipline of plaintiff at issue in this case, as well as being the ultimate authority for DOCCS at an arbitration to uphold the proposed discharge of plaintiff, and, upon information and belief, DOCCS' highest ranking official at the arbitration and DOCCS' ultimate signatory to the Agreement effectuating Flynn's coerced resignation.

6.      Donald Oliver ("Oliver") is upon information and belief, the Deputy Commissioner of defendant's Office of Special Investigations ("OSI"), an entity within DOCCS that upon information and belief, investigates internal disciplinary actions and treatment of officers and officials of DOCCS

**Jurisdiction and Venue**

7.      Jurisdiction is invoked pursuant to Article III of the U.S. Constitution, 28 U.S.C. §§ 1331, and 1343 (a)(3).  Plaintiff brings this action under the First and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. §1983, and there is federal question jurisdiction.  The Court has authority to grant injunctive relief under the federal courts' inherent equitable powers.

8.      Plaintiff seeks to recover money damages against the individual defendants Bloomingdale, Shipley, and Oliver under color of legal authority and state law, and against the state employees in their individual and official capacities.  They acted based on established state procedures.

4

9.     Venue is proper in this jurisdiction based on 28 U.S.C. §1391(e).  Most of the claims arose while the parties met physically in Dutchess County during an arbitration there, and the overall supervision of plaintiff by defendant and DOCCS occurred in Dutchess, Orange, Westchester, and Sullivan Counties in the State of New York.  Venue is appropriate here in the White Plains branch of this federal court.  Plaintiff resides in Orange County.

10.     This is a related case to *Rita Flynn v. DOCCS et. al., Civ. 7:17-cv-02864*, previously filed in this court and dismissed on April 30, 2018.

## Statement of Facts

## Speaking Out about Matters of Public Concern Through the Predicate Lawsuits

11.     Flynn has brought lawsuits in both this Court and State Supreme Court reviewing her actions as a Special Assignment Parole Officer and alleging that she spoke out on a matter of public concern and matters of health and safety to DOCCS.

12.     To first describe the relevant litigations briefly, in 2017, Flynn filed a federal lawsuit, *Rita Flynn v. DOCCS et. al., Civ. 7:17-cv-02864*, a dismissed and related lawsuit in this Court alleging violations of the First Amendment right to freedom from retaliation after the exercise of her First Amendments right to complain about a matter of public concern and alleging retaliation in violation of Civil Service Law §75-b.

13.     This Court ruled that although the Complaint may have stated matters of public concern, such did not amount to constitutionally protected speech protected under the First Amendment to the Constitution.

14.     Flynn's filing of the publicly available claims against DOCCS and its officers did not stop there.  Following dismissal of the federal claims in this court, in September 2018 plaintiff filed an action in Orange County Supreme Court of the State of New York, alleging only retaliation in violation of the Civil Service Law §75-b.  She also filed an Amended

Complaint in September 2018, alleging additional acts of retaliation under the Civil Service Law, including DOCCS' acts in failing to assure the physical safety of Flynn during and after a physical assault by a parolee, resulting in Flynn suffering a concussion.

15.     As described in those lawsuits, DOCCS released Doe released as a sexual offender, and Flynn had multiple complaints about the treatment plan, and the health and safety of the offender, given the lack of services to be provided and the substantial unsupervised travel that would be required.  In September and October 2016, Flynn made multiple complaints to the Assistant Commissioner and others regarding the health and safety effects of releasing the parolee John Doe into the community after his release from state hospital.

16.     In the Amended Complaint brought under the state law (as in the prior dismissed federal lawsuit), Flynn through her public allegations brought a matter of widespread public concern to the State's attention, complaining about the dangers posed by a released sexual offender and the State's failure to act with care and diligence in supervising and treating a sexual offender.  She charged that the sexual offender was inadequately supervised, and would be living and commuting to areas where he would be often exposed to young children.

17.     In state court, Flynn repeated her allegations that she had spoken out on a matter of public concern, and had spoken out on a matter of health and safety under the Civil Service Law, and that DOCCS, as the defendant in that action, had violated that law by retaliating against her.  By asserting these claims again in State court and publicizing them in public Complaints (as well as the earlier one in federal court), she continued to speak out on a matter of public concern about the safety threats posed to the public.

18.     To wit, in the filed state court action alleging violations of the Civil Service Act §75-b, she again repeated at length the endangerment to the public and the parolee

resulting from DOCCS' and other officers acts (as well as the retaliatory treatment afforded to Flynn herself).  Those included statements criticizing the actions at that time of Deputy Commissioner Ana Enright and defendant Regional Director Frank Gemmati and their alleged tolerance about the sexual offender and the risk he posed to the general public.

19.     Both the publicly filed federal and state lawsuits repeated allegations against DOCCS and state officers alleging serious threats of health and safety to the public and DOCCS and officers' failure to properly treat and supervise a recently released sex-offender parolee, criticized the very mission and effectiveness of the Sexual Offenders Management Unit. In detail, the Amended state law complaint detailed the failure to protect the public from potential harm to its safety, quoting extensively from Flynn's warnings about the significant probability that Doe would repeat as a sexual offender with a minor and the potential risk to Doe himself because of inadequate treatment that he received.  (Exhibit A to this Amended Complaint (Amended Complaint, Index No. EF006948-2018, ¶¶20, 26, and 29-47).

20.     In the complaints, Flynn also referred repeatedly to her having recorded and documented the numerous ways in which DOCCS and the Office of Mental Health failed to provide appropriate supervision and treatment of Doe – including failing to provide him an appropriate residence by placing him in a motel with frequent travelers in Liberty, New York. The Complaints also detailed DOCCS' lack of an appropriate plan for Doe's visits to therapy and drug treatment facilities far away in Newburgh, New York in a location with visiting children and close to an elementary school.  (Those allegations as appearing in the Amended Complaint in state court are reported in the attached Exhibit at ¶¶20, 26, and 29-47).

21.     Through plaintiff's continued litigation of the state law whistleblower action, including depositions of multiple officers, and opposition to multiple motions of

dismissal and an appeal, plaintiff has continued to speak out about DOCCS practices and failure to properly protect the public and implement effective and humane treatment for a parolee.

**DOCCS's Harassment of Flynn and Its Manufacturing of Unfounded Criticisms**

22.     DOCCS engaged in multiple incidents of retaliation against Flynn because of her persistence in her use of the litigation system and speaking out through the court filings and litigation process.  This occurred in several additional ways in late 2018 and 2019.  Some of these constitute background information and do not form the basis of the claims against the three defendants here.

23.     First, and most dangerously, DOCCS permitted one of its officers to ignore violence against Flynn by a parolee, when that parolee crashed her knee into Flynn's head while Flynn had attempted to detain her.  The attack occurred less than 10 feet away from the supervising officer while she failed to provide any assistance, and the officer failed to even file a written report of the incident for several days.  Nor did the officer accompany Flynn or assist her in transport when Flynn needed to visit the hospital to treat the resulting concussion.

24.     That failure to accompany an officer physically attacked in the line of duty, and the failure to immediately submit a written report regarding the attack on an officer, departed from Department requirements.

25.     Second and on a continuing basis, DOCCS and its supervisors disciplined Flynn by implementing and delivering to Flynn multiple Notices of Discipline for alleged performance errors, as permitted under the Collective Bargaining Agreement between DOCCS and the New York State Public Employees Federation ("PEF").

26.     The citations in the Notices of Discipline delivered in 2019 varied from alleged errors in being allegedly abrasive with a co-worker in an administrative office when

receiving an assignment from the office, to Flynn's alleged failure to submit appropriate time sheets and then overtime sheets in a timely manner, to her alleged failure to complete an assignment regarding a client while on vacation and sick leave, and then having to complete it with overtime work on her return 7 weeks later.  Some also disciplined her for actions such as reentering the computer system to properly indicate accurate information regarding a parolee, such as one example where she corrected a DOCCS omission and added an entry with the proper indication regarding the status of a Level 3 pedophile**.**

27.     DOCCS manufactured these disciplines, as they relied on mistakes or actions by DOCCS itself, Flynn's correction of or cleaning up such actions, or were simply untrue.  These Notices of Discipline began to mount, totaling five by mid-2019.

28.     But Shipley and Bloomingdale triggered some of the violations claimed here based on their participation and authorship of many alleged incidence of violations contained in a sixth August 5, 2019 Notice of Discipline ("NOD") pursuant to the CBA. Shipley, Bloomingdale, and DOCCS's sought plaintiff's termination of employment in connection with her providing information regarding an investigation conducted by DOCCS' OSI in 2018 to 2019, and Flynn having sent emails to her attorney and Oliver, in his capacity as the OSI Deputy Commissioner.

29.     That investigation, plaintiff's actions in providing information for that investigation, and Shipley's and Bloomingdale's actions in seeking to enforce and effectuate the termination of Flynn's employment, form the gravamen of Flynn's complaint that defendant violated her constitutional rights.

**The OSI Investigation and Defendants' Acts to Discharge Flynn**

30.     Upon information and belief, OSI began an investigation in 2018 regarding the series of grievances filed by Flynn and whether DOCCS had adhered to the internal standards for fair evaluation in its treatment of Flynn.  On November 30, 2018, OSI's Deputy Commissioner Donald Oliver conducted a transcribed interview of Flynn regarding multiple complaints and grievances she had made about her treatment by DOCCS following the filing of Flynn's multiple lawsuits.  OSI conducted the deposition over a period of many hours, and the subject of it was about incidents where Flynn was alleging retaliation against her by officers that she worked with, or misconduct that had occurred but which she often received some blame.

31.     Upon information and belief, the investigation and the inquiries on November 30, 2018 did not concern any wrongdoing by Flynn, nor any unauthorized disclosure of any confidential information.  Flynn and her counsel had every reason to believe that Oliver's investigation was focused on retaliation, and the acts of other DOCCS' employees against her.

32.     Not all of the information supporting retaliation against Flynn could be provided in one long session deposing Flynn about the multiple allegations and examples of retaliation.  Accordingly, as part of its investigation of retaliation against Flynn, Oliver welcomed and *asked Flynn to supply* any updated and additional information from Flynn as to any additional information she could provide about the examples of retaliation, as well as any further retaliation.

33.     Oliver also had some interaction with Flynn's counsel during this period and was aware that she was represented in the state court action.  Oliver made clear to counsel that his inquiry had nothing to do with any allegations in the state court complaint and that he had nothing to do with that ongoing litigation.

*34.*     But Oliver did inform this attorney, as Flynn's counsel, about the plans for deposing Flynn, as well as confirming in December 2018 that Flynn should send him any materials relevant to her allegations of retaliation against Flynn, and that he *had told Flynn that such could assist the investigation and that she could do so.*

35.     This Flynn did, sending further details by email and in a hard copy package of different investigations and workplace occurrences when Flynn had been upbraided for performing her job duties in a responsible manner and in the protection of public safety. These included communications with Oliver about the workplace issues also included her counsel, where she provided information with respect to issues involving retaliation at the workplace in her administration of Parole cases and the performance of her duties.

36.     In describing and identifying workplace issues and incidents in her communications with Oliver, Flynn often referred to particular parolees or individuals with whom she and other staff came into contact or were the subject of the incidents.

37.     Oliver clearly had knowledge that the instant counsel for Flynn had also received many of these materials from Flynn, as counsel's law firm email address appeared on almost all of the emails sent by Flynn during December 2018 and January 2019.  Oliver of course also knew that there was an attorney-client relationship between Flynn and this counsel, and that he was representing Flynn.

38.     Oliver never informed Flynn, nor this counsel, about any impropriety in her sharing her communications about workplace issues nor in identifying any of the individual parolees.

39.     In these examples, Flynn often addressed problematic interventions where DOCCS had failed to act properly, but for which DOCCS had blamed her in some way for

having taken action or making a report that she believed was required.  Flynn emailed Oliver

(with a copy to counsel) on almost a dozen times occasions after December 1, 2018 up until at

least February 27, 2019**,** providing examples of particular cases of DOCCS retribution against

her after she engaged in safe practices and required reporting.

      40.     The workplace information sent to OSI and Flynn's attorney described

workplace events where Flynn had faced some type of workplace retribution from DOCCS,

sometimes referring to physical threats.  Those included examples such as (1) when DOCCS sent

Flynn into a gang member's home who was believed to be armed; (2) when another gang

member threatened Flynn's life when she came to the aid of a man lying unconscious in the

street; and (3) when DOCCS reprimanded her for referring a case to Child Protective Services

involving a then non-Parolee.

      41.     One example related to retaliation against Flynn because of her entry of

information in the computer system about a parolee that was at large and with a gang; another

about her entry of information for a parolee who had violated the terms of his parole; another

discipline because of her new October 2018 entry marked "INDICATED" showing the correct

Child Protective Services determination regarding a Level 3 pedophile – even when she reported

to the Albany hotline the pedophile's documented (in a photograph) contact with an at-risk 2-

year old, and even after the 2-year old was found to have rectal bleeding.  Flynn reported to

Oliver that she was told "to mind your own business" and that she would never receive any

additional overtime.  Another example Flynn communicated to Oliver was about a CPS report

she made to the Albany hotline to remove an infant from the home of an ex-parolee, with reason

to believe that she was actively taking heroin.  Flynn communicated with Oliver about how she

had been disciplined by DOCCS for making the report, even though the ex-parolee was on the

"most wanted" list two weeks later and even though Orange County Child Protective Services had thanked Flynn for her vigilance in protecting the newborn.

42.     All of the parolees and individuals identified, except for one, were not Sexual Offenders or individuals who had been so identified in the past.

43.     In all, when Flynn provided Oliver with the examples of DOCCS' retribution, Flynn routinely also copied her counsel representing her on the earlier claims of retaliation under the Civil Service Law §75-b being litigated in the state court action.  Flynn kept her attorney abreast of the examples she submitted by also providing him with the identical examples that she sent to Oliver.  She maintained this communication with her attorney so as to assist him in any claims pending with the state court, and as part of her seeking effective counsel in that action, as well as in her seeking redress through the OSI investigation of DOCCS' treatment of her.

44.     Later, in early 2019 another OSI Officer visited Flynn and others at her work location to conduct interviews.  He told Flynn that he thought that she should keep working to clear her name.

45.     Upon information and belief, by sometime in the late winter or early spring of 2019, the OSI investigation radically changed focus.  Oliver and OSI apparently launched an investigation of Flynn and the propriety of including her counsel in her communications with Oliver that had also included her counsel.

46.     Oliver launched this investigation even though he had generally encouraged Flynn and his attorney to provide any information that they believed would be relevant to his investigation.  He did so even though he had never alerted Flynn or her attorney to including counsel or to stop sending any material.

47.     Neither Oliver nor anyone else from OSI or DOCCS' regional administration ever warned or admonished Flynn for sending such information, or ever informed this attorney that Flynn should stop doing so because of the confidential nature of the material. No such warning was ever given, despite several telephone communications between this counsel and Oliver.

48.     In reality, sometime in early 2019 (and upon information and belief), Oliver had ceased to conduct any investigation of retaliation against Flynn – if it had indeed ever existed.  Rather, by then the only investigation by Oliver concerned Flynn's communications with this counsel regarding information provided by Flynn as *part of her assistance to the investigation of the retaliation against her by others.*  Flynn became the target of the investigation.  In doing so, he acted based on established state procedures

49.     By now making such communications about her assisting an investigation the basis and *centerpiece of a new investigation against her*,  Oliver and DOCCS engaged in a Kafka-esque process.  Providing information simultaneously to her attorney and the investigator now became the new misconduct, crime and the subject of a newly created investigation.  A new investigation that only occurred because of Flynn's participation in the earlier investigation conducted by defendant Oliver.

50.     Further, Oliver participated in investigating and interfering with Flynn's right to seek the assistance of counsel and the involvement of counsel in any investigation concerning Flynn's employment.  In effect, Oliver punished Flynn for consulting with and informing her counsel about the information provided when he then proceeded to charge Flynn for wrongdoing.

51.     On approximately May 3, 2019, Oliver did inform counsel that the large volume of material and information that Flynn had continued to provide was no longer particularly helpful.  Oliver explained that OSI had limited resources - only 18 investigators in his staff - to review every incident referred to by Flynn or to review that volume of information, and that a constant stream of more submissions could delay the completion of its investigation.

52.     As directed, Flynn then ceased to send any more materials to Oliver.

53.     Despite the lack of warning provided about the emails Flynn sent to Oliver and also received by counsel in the period after December 1, 2018, DOCCS did stop some communications.  DOCCS informed Flynn, with Shipley's knowledge on January 10, 2019, that she should "cease and desist" from communicating by email about internal DOCCS matters (not of a confidential nature) with Deputy Commissioner Ana Enright.  DOCCS was fully able of ordering Flynn to "cease and desist" from less sensitive communications with the state-wide Commissioners.

54.     Flynn later received the August 5, 2019 NOD alleging that her alleged disclosure of confidential information to her personal email and counsel (and often also sent to Oliver) violated restrictions on protecting correspondence regarding parolees and their identities. Shipley signed the NOD as the Director of the Bureau of Labor Relations.

55.     Upon information and belief, in bringing the NOD and then enforcing it in the first place later in 2019, defendants Bloomingdale, Shipley and non-defendant DOCCS relied upon the investigation conducted by defendant OSI Deputy Commissioner Donald Oliver.  In doing so, Bloomingdale and Shipley also interfered with Flynn's right to consult counsel in the ongoing civil matter and his ability to keep abreast of facts relevant to that lawsuit.

56.     The approved NOD and its prosecution by defendants Bloomingdale and Shipley sought extreme discipline against Flynn for keeping her attorney informed of the ongoing workplace harassment and retribution – retribution for her efforts in seeking appropriate supervision of parolees and notation of accurate safety information.

57.     Nor had OSI or Oliver ever alleged that Flynn or her counsel had, in the process of imparting information regarding her complaints and alleged retaliation, ever shared any information regarding parolees with anyone else outside the Parole system - and least of all in any public forum.  In her original 2017 and 2018 complaints regarding "John Doe," she and her attorney had never disclosed the identity of that parolee or any other confidential information.

58.     Through this NOD, Bloomingdale, Shipley, and DOCCS proposed that Flynn's employment with DOCCS - dating from 1979 - be terminated.  They gave notice of this proposed termination, despite the fact that OSI had been in receipt and fully aware of all such communications for many months between December 1, 2018 and May 2019, and aware that Flynn had emailed all such communications to her counsel.

59.     Upon information and belief, they were also aware, contrary to the NOD, that Flynn had utilized her personal email for sending work information for many years.  Indeed, even on the last day of her employment before suspension, her supervisor ordered her to send a subpoena via her personal phone.

60.     Bloomingdale, Shipley, and DOCCS sought Flynn's termination despite her over cumulative seventeen years of devoted work as a Parole Officer on Special assignment with SOMU --and despite her considerable expertise with sexually offending parolees and understanding the issues about working with parolees, and treatment and residential facilities.

61.     After Bloomingdale, Shipley, and DOCCS sought her termination through the NOD, Flynn invoked the provisions of the Collective Bargaining Agreement between the PEF and DOCCS, exercising her right to file a grievance regarding her discipline for having shared information with counsel.

62.     It was defendant Bloomingdale from DOCC's Human Resources office that DOCCS assigned to manage and uphold its proposed discharge of Flynn, and to represent DOCCS at the arbitration hearing seeking Flynn's ouster.   Upon information and belief, Shipley also participated.

63.     DOCCS, through defendants Bloomingdale and Shipley, and PEF proceeded to adjudicate only the termination Notice of Discipline after proceeding through numerous steps in the CBA grievance process.  On February 24, 2020, DOCCS and PEF held an arbitration of Flynn's challenge to the termination action, attended by Bloomingdale representing DOCCS, and supervised in some manner by Shipley.

**The Arbitration and Defendant's Violations of Flynn's Constitutional Rights**

64.     At that arbitration, PEF's counsel represented Flynn in her challenge to DOCCS's proposed termination, and to do so by defending the charges against her.  Flynn planned to present evidence and witnesses regarding her very satisfactory performance, and important character references regarding her exemplary performance as a Parole Officer for DOCCS during the preceding 40 years -- as well as evidence that DOCCS' actions retaliated against her for having filed the state court action.  She planned to argue that the discipline was not in itself justifiable nor in good faith.

65.     Flynn, however, never had an opportunity to defend her actions nor to present evidence that DOCCS' proposed termination was in fact a pretext for its own retaliation

against her.  Instead, at the outset of the arbitration, DOCCS' human resources manager Matthew Bloomingdale proposed a settlement to PEF's attorney representing Flynn:

66.     If Flynn did not withdraw her grievance and voluntarily resign her employment and retire from DOCCS, Bloomingdale, Shipley, and DOCCS would *refer Flynn to law enforcement for prosecution on approximately 40 counts* of Class B misdemeanor violations, with a *minimum jail time of two years*.

67.     This injected an essentially new issue and broad attack, where Flynn had earlier heard about one potential count from PEF counsel. Flynn understood she was there to defend her actions and challenge the termination of her employment as an arbitration matter – and not to adjudicate a slew of 40 criminal counts nor make decisions about a threat to her very freedom.

68.     Presumably, in referring to 40 criminal counts, defendants were referring to alleged violations of the Sexual Offenders Registration Act.  But in all of the communications, *only one* concerned an individual who had been supervised by SOMU.

69.     Defendants nevertheless concocted a threatened criminal sanction that did not match nor was supported by their own written Notice of Discipline.  Defendants knowingly exaggerated and overstated the potential criminal sanction when characterizing her of engaging in 40 incidences of releasing *confidential information about Sexual Offenders.*  But in their own itemized naming of the individuals at issue, *only one* of the individuals appearing in her emails referred to an individual who was in fact a Sexual Offender.  Defendants based the threat of the incarceration and 40 counts of Class B violations on supposed disclosures about Sexual Offenders – where the disclosures *did not even relate* to Sexual Offenders (in 39 out of the 40 incidences).

70.     Defendants thus weaponized the disclosure allegations and came down on Flynn with a ton of bricks, concocted into a much heavier and more threatening weight of facing 40 counts of criminal conduct.  Facing such a constructed heavy burden as a layperson, it was all the more essential for Flynn to consult with a criminal attorney before making vital decisions about her future and freedom.

71.     Reacting to the severity of the threat and charges communicated – even inaccurately – by defendants, Flynn became alarmed and requested more time in which to consult a criminal attorney to advise her about these serious threats of prosecution.  On further advice, she also requested an adjournment of the arbitration in order for her to seek counsel from a criminal attorney.

72.     Even after Flynn briefly consulted with a criminal attorney by telephone, Bloomingdale and Shipley, upon information and belief, denied Flynn's request for an adjournment.  Following a conversation between Flynn, the criminal attorney and PEF's attorney, the PEF attorney, upon information and belief, sought an adjournment so that Flynn could continue her consultation with criminal defense counsel.

73.     Instead, the PEF attorney  informed Flynn that he had learned from DOCCS (that is, defendants Bloomingdale and Shipley) that even a short one-week adjournment to consult with criminal defense counsel was unavailable.

74.     In proposing that Flynn resign and withdraw her grievance's challenge to her proposed termination, Bloomingdale and Shipley ran roughshod over Flynn's efforts of more than forty years' investment in her work as a Parole Officer with special training and skills, and the importance of that position to her career.  They both brought their power as high-level state

labor officials to bear so as to interfere with her livelihood and property interest in preserving her career and job status.

75.     But while first attempting to preserve her employment and the vital question of her future employment, Bloomingdale and Shipley confronted Flynn with the serious choice of having DOCCS refer her for prosecution on 40 counts of a B Class misdemeanor, if she failed to comply by refusing to resign.  And by injecting the threat of criminal prosecution and communicating such to PEF's attorney, defendants potentially ran afoul of New York Penal Code §135.60 - engaging in the crime of coercion.  Coercion may be committed by compelling the victim to engage in conduct (here, resignation or job abandonment) from which she had the right to abstain by instilling in her a fear that he will cause criminal charges to be brought against her.

76.     No matter.  Bloomingdale and Shipley sought to effectuate their goal of seizing on Flynn's alleged violation and applying maximum pressure – and even by misstating and exaggerating the actual nature of Flynn's alleged criminality.  All apparently done to aggrandize and add heft to the "cudgel" that defendants brought to bear against plaintiff so that she would resign her long-held employment.

77.     That is, Bloomingdale and Shipley overstated the nature of the potential criminal prosecution so as to strip Flynn of her job position – and to punish her exercise of her freedom of speech and perseverance in her litigations against DOCCS and its officers.  A freedom of speech implicating a matter of public concern, and speech made to the public through her pursuit and filing of litigation against DOCCS and its officers.

78.     Further, in doing so, defendants interfered with Flynn's right to counsel by declining to allow her to pursue the issue of retaining and getting advice from a criminal attorney

about her exposure to prosecution, before she made any fateful decision to resign.  Bloomingdale

and Shipley further compounded this denial of counsel by pressuring an immediate decision by

Flynn, and rejecting Flynn's request for an adjournment, even after she spoke with criminal

counsel.

79.     Ultimately, Flynn acted on her alarm and fear:  she resigned her position

on the spot and reviewed the paperwork and Agreement submitted to her by DOCCS and PEF as

necessary for resigning her position and taking retirement.  But she did so under duress.  In

reviewing the Settlement Agreement submitted to her by Bloomingdale and Shipley, Flynn

specifically deleted the language stating that she had *not* entered into the agreement under

duress.

80.     Flynn then signed the Agreement to resign her employment, with that

revision, as did Shipley.  Flynn's striking the absent "duress" condition phrase signified that the

Agreement had indeed been secured under duress given the serious threats made, and the refusal

to permit her to consult with her chosen criminal attorney.

81.     When Flynn received the finalized Agreement, it was Shipley's signature

appearing on the document, as DOCCS' "Director of Labor Relations." Shipley participated in

reviewing Flynn's revision to the Agreement, as secured by Bloomingdale.  Through his

signature and approval at the end of this process, Shipley signaled his agreement, participation,

and even supervision of DOCCS' conduct and its coercion of Flynn so as to secure her

resignation.

82.     More specifically, Flynn resigned as Bloomingdale and Shipley retaliated

against her for having exercised her rights to free speech by threatening her freedom (through

criminal prosecution) and depriving her of her right to counsel when making an all-important

decision about her long investment in her career and her future.  As Flynn had spoken out on a matter of public concern by prosecuting her two public cases in the years between 2017 and 2019, Bloomingdale and DOCCS now sought to punish and discharge her.

83.     In defendants' and DOCCS' focus on Flynn's having sent alleged confidential information to OSI and her attorney, defendants seized on manufactured charges as a pretext, and Bloomingdale and Shipley misrepresented 39 counts as Class level misdemeanors, and set the stage for their retaliation against Flynn in violation of her First Amendment right to free speech.  Flynn had had a lawful reason for providing that information, it had even been requested by OSI in the first place.

84.     Nevertheless, Bloomingdale, Shipley and DOCCS misrepresented those disclosures as relating to Sexual Offenders when they did not, and wielded a heavy tool of 2 years' incarceration to effectuate their retaliation.

85.     The coupling of Bloomingdale's and Shipley's argument for discharge with a threat of criminal prosecution and a withholding of attorney advice violated Flynn's constitutional right to free speech, as well as additional constitutional rights.

86.     For in subjecting plaintiff to making such a vital decision while facing criminal prosecution, defendants Bloomingdale and Shipley violated plaintiff's 14th Amendment rights to substantive and procedural due process.  Plaintiff retained a property right and a reasonable expectation of liberty in her job, yet defendants' threats of criminal prosecution and interfered with her right to substantive due process.

87.     Defendants Bloomingdale and Shipley stripped Flynn of her right to a fair process and an ability to make a reasoned and thoughtful decision about her future, while under

threat of criminal prosecution. That severe pressure to her very freedom, and brought to bear over a period of an hour to choose, violated procedural due process.

88.     They further denied fair process by refusing an adjournment so that Flynn could consult further with the same criminal defense counsel – even when she had specifically requested such representation and spoken to the attorney.

89.     In doing so, Bloomingdale and Shipley trampled Flynn's rights.  By denying Flynn counsel, wielded a threat to Flynn's freedom and secured Flynn's coerced abandonment of her long career at DOCCS.  And they did so in the context of Flynn specifically refusing to recognize that there had been no duress imposed on her.

## FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

### (First Amendment, Speaking on a Matter of Public Concern)

90.     Plaintiff claims that defendants violated the First Amendment of the Constitution and 42 U.S.C. §1983 and repeats and realleges paragraphs 1 through 89 of this Complaint as if set forth herein.

91.     The First Amendment to the Constitution guarantees the right to free speech and the right to petition the government for redress of grievances.  Government officials may not interfere with those rights directly, punish an individual or employee for the free exercise of such rights, or engage in retaliatory action aimed at chilling the future exercise of those rights.

92.     Defendants retaliated against plaintiff after she filed repeated lawsuits that spoke out on a matter of public concern violated the First Amendment.

93.     Defendant Oliver's acts in seemingly starting an investigation and deposing Flynn about the retaliation against her, and then turning to an investigation of her,

was retaliatory and violated the First Amendment.  It did so in substantial part because Oliver seized on Flynn's communications with counsel during the alleged investigation of retaliation, and used those to now investigate Flynn herself – while interfering with her right to counsel and consultation with her attorney.

94.     Oliver did so with a retaliatory motive.  Oliver acted under the color of state law in taking retaliatory action against plaintiff and interfering with her exercise of free speech – particularly where he himself had requested and welcomed assistance from Flynn in collecting information and documents relevant to the investigation.

95.     Defendants Bloomingdale and Shipley's threat of criminal prosecution was falsely represented, without any intrinsic merit, and merely a gambit in order to secure Flynn's discharge and resignation.  In threatening Flynn with the serious consequence of criminal charges, defendants sought to chill Flynn and punish her for her exercise of her First Amendment right to speak out to the public – through her lawsuit – on a matter of public concern.

96.     Bloomingdale and Shipley, in effectuating DOCCS's design to accomplish Flynn's forced resignation acted under the color of state law in taking retaliatory action against plaintiff and interfering with her exercise of free speech.

97.     As a result of those two defendants' retaliatory actions in securing Flynn's coerced resignation under great duress Flynn is suffering  financial hardship and a loss of employment.  Such threats and fear of prosecution and loss of employment and a career of 40 years as a parole officer, also caused Flynn to suffer severe emotional harm, adversely affected her reputation in the law enforcement community, and greatly aggravated her anxiety and worry as to her future livelihood and support and professional standing in the law enforcement

community.

98.     By reason of the foregoing, all three defendants are liable to Flynn for damages, including compensatory damages, costs and disbursements, the exact amount to be proven at trial, and attorneys' fees under all the claims above.  Plaintiff seeks to recover money damages against the individual defendants acting under color of legal authority and in their individual capacities.

99.     Further, plaintiff requests injunctive and declaratory relief from defendants Bloomingdale and Shipley in their individual and official capacities, including requiring defendants to place Flynn in the same position she was prior to the violation, that is reinstated to her job position, still subject to discipline with a right to grieve her termination before her resignation and discharge.

## SECOND AND THIRD CAUSES OF ACTION AGAINST
## DEFENDANTS BLOOMINGDALE AND SHIPLEY

### (Procedural Due Process under the 14th Amendment)

100.     Plaintiff claims that defendants violated the Fourteenth Amendment of the Constitution and 42 U.S.C. §1983 and repeats and realleges paragraphs 1 through 99 of this Complaint as if set forth herein.

101.     The Fourteenth Amendment to the Constitution guarantees the right to procedural due process and protection of individual rights.

102.     Bloomingdale's and Shipley' threat of prosecution was falsely represented, without any intrinsic merit, and merely a gambit in order to secure Flynn's

discharge and resignation.  In threatening Flynn with the serious consequence of criminal charges, defendants sought to achieve the result they wanted – Flynn's resignation – without the most basic consideration of Flynn's right to procedural due process.  By making such falsely represented threats of criminal prosecution and refusing Flynn the right to an adjournment or the ability to consult with a criminal attorney for a reasonable period in which to make a reasoned determination about giving up her employment of 40 years, defendants violated the basic tenets of procedural due process afforded a citizen by Government.  Threatening prosecution on 40 Counts – 39 concocted as Sexual Offender related - of a Class B Misdemeanor violated procedural due process and her opportunity to address the misstatements underpinning defendants' threats of prosecution.

103.    Clearly, in itself, it is a violation of procedural due process to engage in coercion in potential violation of New York Penal Code §135.60 where defendant compelled Flynn to engage in conduct (resignation) from which she had the right to abstain.  Those rights to procedural due process rights – and freedom from coercion to resign where she had CBA rights to abstain from such – applies to the process for disciplinary and arbitration proceedings.  Even proceedings pursuant to a CBA.

104.    Bloomindale and Shipley, in effectuating DOCCS's design to accomplish Flynn's resignation, acted under the color of state law in taking acts that knowingly violated Flynn's rights to procedural due process as protected by the 14th Amendment.  They acted based on established state procedures.

105.    As a result of those two defendants' actions in securing Flynn's coerced resignation under great duress and the denial of a reasonable adjournment for consulting with a criminal attorney, Flynn is suffering  financial hardship and a loss of employment.  Such threats,

and fear of prosecution and loss of employment and a career of 40 years as a parole officer, also caused Flynn to suffer severe emotional harm, adversely affected her reputation in the law enforcement community, and greatly aggravated her anxiety and worry as to her future livelihood and support and professional standing in the law enforcement community.

106.      By reason of the foregoing, those two defendants are liable to Flynn for damages, including compensatory damages, costs and disbursements, the exact amount to be proven at trial, and attorneys' fees under all the claims above.  Plaintiff seeks to recover money damages against each individual defendant acting under color of legal authority and in his individual capacity.

107.      Further, plaintiff requests injunctive and declaratory relief from those two defendants in their individual and official capacities, including requiring defendants to place Flynn in the same position she was prior to the violation, that is reinstated to her job position, still subject to discipline with a right to grieve her termination before her resignation and discharge.

108.      Similarly, those two defendants' actions in disciplining Flynn in the first place for allegedly inappropriate communication with her attorney interfered with her relationship with her civil attorney and with her right to seek advice in an ongoing litigation from counsel. Such should also include whether Flynn should be subjected to discipline and arbitration of her claims in the first place, since defendants' discipline of Flynn interfered with the attorney-client relationship.

## FOURTH AND FIFTH CAUSES OF ACTION AGAINST DEFENDANTS BLOOMINGDALE AND SHIPLEY

### (Substantive Due Process under the 14th Amendment)

111.    Plaintiff claims that defendants violated the Fourteenth Amendment of the Constitution and 42 U.S.C. §1983 and repeats and realleges paragraphs 1 through 110 of this Complaint as if set forth herein.

112.    The Fourteenth Amendment to the Constitution guarantees the right to substantive due process, including the protection of the property and liberty interests.

113.    Bloomingdale's and Shipley's threat of prosecution was falsely represented, without any intrinsic merit, and merely a gambit in order to secure Flynn's discharge and resignation.  In threatening Flynn with the serious consequence of criminal charges, defendants sought to achieve the result they wanted – Flynn's resignation – without any consideration of her interest in the property of her ongoing employment and her interest in liberty, free from harassment or the threat of arrest and prosecution.  Threatening prosecution on 40 Counts – 39 concocted -- of a Class B Misdemeanor threatened her property interest in her ongoing 40-year career and employment.  The threat of prosecution as made in exchange for giving up her job raised the specter of interfering with her liberty if she chose to continue her arbitration of the matter of continued employment.

114.    Those two defendants, in effectuating DOCCS's design to accomplish Flynn's resignation acted under the color of state law in taking acts that knowingly violated Flynn's rights to substantive due process as protected by the 14th Amendment.  They acted based on established state procedures.

115.    As a result of those two defendants' actions in securing Flynn's coerced resignation under great duress and the threat of prosecution interfering with her property right in her job as well as her liberty interest, Flynn is suffering  financial hardship and a loss of employment.  Such threats, and fear of prosecution and loss of employment and a career of 40

years as a parole officer also caused Flynn to suffer severe emotional harm, adversely affected her reputation in the law enforcement community, and greatly aggravated her anxiety and worry as to her future livelihood and support and professional standing in the law enforcement community.

116.    By reason of the foregoing, those two defendants are liable to Flynn for damages, including compensatory damages, costs and disbursements, the exact amount to be proven at trial, and attorneys' fees under all the claims above.  Plaintiff seeks to recover money damages against each individual defendant acting under color of legal authority and in his individual capacity.

117.    Further, plaintiff requests injunctive and declaratory relief from those two defendants in their individual and official capacities, including requiring those defendants to place Flynn in the same position she was prior to the violation, that is reinstated to her job position, still subject to discipline with a right to grieve her termination before her resignation and discharge.

**SIXTH CAUSE OF ACTION AGAINST DEFENDANT OLIVER**

**(Procedural Due Process under the 14th Amendment)**

118.    Plaintiff claims that defendant Oliver violated the Fourteenth Amendment of the Constitution and 42 U.S.C. §1983 and repeats and realleges paragraphs 1 through 117 of this Complaint as if set forth herein.

119.    The Fourteenth Amendment to the Constitution guarantees the right to procedural due process and protection of individual rights.

120.    Defendant Oliver encouraged Flynn to send any relevant information and then contributed to bringing charges against her for doing so – also thereby interfering with her

free speech.  This Kafka-esque prosecution of Flynn after she provided information, and the interference with her right to include her counsel about the progress and substance of the topics for investigation, violated Flynn's constitutional right to procedural due process.

121.    Oliver both punished Flynn for having participated in and contributed information to the constable to assist him in investigating mistreatment of her by DOCCS's officers and for informing and relying upon her counsel in the process of that investigation.

122.    Oliver thus violated Flynn's rights to a fair investigatory process, and to her right to rely on counsel in some way during that investigatory process.  He acted based on established state procedures.

123.    By reason of the foregoing, Oliver is liable to Flynn for damages, including compensatory damages, costs and disbursements, the exact amount to be proven at trial, and attorneys' fees under all the claims above.  Plaintiff seeks to recover money damages against Oliver while acting under color of legal authority and in his individual capacity.

**WHEREFORE**, Plaintiff, Rita Flynn, demands judgment against Defendants as follows:

(a)    on the First, Second, Third, Fourth, Fifth, Sixth, and Seventh Causes of Action, an award of statutory damages, the exact amount to be proven at trial against the applicable defendants, including, but not limited to, attorneys' fees, costs and disbursements incurred in connection with this action; and appropriate injunctive relief as the Court may determine, including reinstatement to her position and a return to arbitration of the proposed discipline and termination of employment with DOCCS.

Dated: Croton-on-Hudson, New York
     July 27, 2021

MICHAEL RANIS

By:   _s/Michael Ranis, Esq._
    Michael Ranis, Esq.
Attorneys for Plaintiff
32 Riverview Tr.
Croton-on-Hudson, NY  10520
914-584-6445 (MBR #3757)