# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ORANGE
_____

RITA FLYNN,                                          Index No**.** EF006948-2018

                                    Plaintiff,        **AMENDED COMPLAINT**

              -against-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS and COMMUNITY SUPERVISION,

                                    Defendant.
_____

              Plaintiff, Rita Flynn, by her attorneys, Foulke Law Firm, as and for her Complaint

against defendant, alleges as follows:

<b>Jury Demand</b>

1.   Plaintiff demands a trial by jury of all issues in this action.

<b>Nature of the Action and Preliminary Statement</b>

2.   This is an action under Civil Service Law §75-b, and as a whistleblower

action, alleging that defendant DOCCS, alleging that defendant demoted plaintiff Rita Flynn

from her Special Assignment supervising released sex-offenders in retaliation for her multiple

complaints about violations of law and a court Order – complaints about serious safety risks

posed to the public at large and grave deficiencies in the supervised release of a paroled SIST sex

offender.

3.   In performing her job duties as a parole officer supervising the release of sex-

offenders into the community-at-large, Flynn complained to her superiors – including several of

the Governor of New York, Andrew Cuomo's political appointees, including, upon information

and belief, to the DOCCS Commissioner  -- about violations that allowed a newly released

1

convicted pedophile and sexual offender to pose serious risks to young girls and children in Orange and Sullivan counties.

4. As executed in the plan for his release, "John Doe" or "Doe" was to make frequent visits from Sullivan to Orange County for treatment visits after his release from prison – and to areas where there was a high risk of contact with elementary school children and families with young children – while receiving what Flynn had identified as grossly inadequate and partial treatment and supervision. Flynn complained about major gaps in supervision and treatment of this developmentally disabled sex offender, a planned negligence and lack of monitoring of his activities, and later about Doe's violations of his parole, following his actual release into the community.

5. Flynn alerted Defendant about the substantial violations and deficiencies by Defendant of treatment requirements under the Mental Hygiene Law, and violations by Doe of the Court Order that conditioned Doe's release. Such complaints constituted violations of the Mental Hygiene Law's regulations on strict supervision, and identified serious safety risk factors that this sexual predator posed to the community's children. Rather than acting promptly on Flynn's series of warnings and encouraging a swift and safe resolution by the State Agencies, Defendant instead removed and stripped Flynn of the Special Assignment monitoring parolee sexual offenders, and harmed her livelihood and professional reputation by prohibiting her from earning substantial overtime payments while working in her area of professional expertise.

6. Flynn brings this action to remedy such unlawful conduct and to reclaim her lost salary and benefits, as well as to claim attorneys' fees under the Whistleblower Law.

**The Parties**

7. At the time of the acts complained herein, plaintiff Rita Flynn ("Flynn") was

and is a resident of Chester, New York, County of Orange, New York.

8.   Defendant State of New York, Department of Corrections and Community Supervision ("DOCCS"), is an agency of the State of New York that administers the State's prisons, and release of eligible parolees (including sex offenders) into the community at-large.

9.   At the time of the events complained herein, plaintiff Rita Flynn was a Parole Officer ("PO") employed by DOCCS on Special Assignment working with released sex offenders, as a provider of strict and intensive supervision.   Flynn's immediate DOCCS supervisor worked in Peekskill, New York, and Flynn worked out of DOCCS' offices in Orange and Sullivan Counties.  During that same time, she has and continues to reside in the County of Orange, State of New York.  Flynn has been employed by DOCCS since 1979.

### Jurisdiction, Venue, and Tolling

10. As referred to in the Preliminary Statement, Plaintiff here brings a state law Civil Service "Whistleblower" Law claim. She has met the necessary prerequisites to bring this action.

11. A substantial portion of the actions complained about occurred in Orange and Westchester Counties, State of New York, and venue is appropriate here.  Plaintiff resides in Orange County.

12. Further, plaintiff had no effective recourse through the grievance process, and after she filed a grievance complaining of her demotion, and loss of income,  such was denied by defendant at Stage II.  The Articles of the relevant Contract do not guarantee her a right to arbitration of such claims or to appeal such to arbitration.  She does not fail to exhaust any administrative remedies by filing in this Court, or earlier in federal court, nor end this action: there is no "final and binding arbitration provision" to resolve alleged violations that is available

to Flynn as a matter of right.  As such, Civil Service Law §75-b(3)(c) allows plaintiff to

"commence an action in a court of competent jurisdiction" –that is, this Court.

13. Plaintiff originally filed her claim under Civil Service Law §75-b on April 20,

2017, and in an Amended Complaint of August 17, 2017, brought in federal court with a

constitutional claim under the First Amendment for speaking out on a matter of public concern.

On April 30, 2018, the federal court dismissed the constitutional claim alleging retaliation in

violation of the First Amendment, without ruling in any way on the Civil Service Law claim

before it in the exercise of its supplemental jurisdiction.  As such, there is no *res judicata* or

estoppel effect on such claim, it is properly tolled and is now timely filed with this Court.

## Statement of Facts

### Background and Flynn's Employment

14. Flynn has been employed as a parole officer ("PO") for the State of New York

since 1979.  Earlier in approximately 2000, and most recently from 2007 until October 28, 2016,

she has worked in a more specialized Special Assignment PO capacity as a Sexual Offender

Parole Officer, as part of a team administering strict and intensive supervision of sex offenders

released from prison on parole.  In that role, she has become expert in the area of closely

monitoring sex offenders and protecting of children and citizens in the community from sexual

offenders -- and extremely knowledgeable about daily living, functioning, reviewing behavioral

warning signs, and clinical and safety issues regarding those offenders.

15. Given the immediacy of issues regarding sexual offender parolees and the

need for intensive supervision and treatment, attendance at off-hours residences and treatment

offices facilities, and Flynn's overall skill and diligence in working with clinical treaters and

local law enforcement, Flynn earned substantial overtime as part of her total annual

compensation.  Indeed, by calendar years 2013-2015, Flynn's overtime earnings from substantial

overtime hours worked accrued to be almost as large as her base salary.

16. Indeed, Flynn's willingness and ability to work substantial overtime hours is a

requirement of her responsibilities as a Sexual Offender/SIST Parole Officer ("SOPO") on

Special Assignment, reviewing and enforcing the required regimen of Strict and Intensive

Supervision and Treatment ("SIST") for affected parolees.  (A regimen of specific SIST

conditions is a legal requirement pursuant to Mental Hygiene Law §10.11 (a) (2) prior to and

during the release of sexual offenders, as discussed below).  In fact, most PO's are not interested

nor motivated to do such work, because of the high stress and long hours, despite the substantial

available overtime earnings.

17. Flynn's performance appraisal for the year ending September 30, 2016 – just a

month before her removal from her Special Assignment -- noted that Flynn's performance

"exceeds the performance standards" and emphasized that Flynn was "a team player."

18. At this time, Flynn worked with Director of Sexual Offenders Management

Unit ("SOMU") Mary Kopp-Adams ("Kopp-Adams"), an officer of DOCCS appointed by the

Governor of New York.  At the time, Kopp-Adams had statewide supervision of DOCCS' strict

and intensive supervision cases ("SIST cases") governed by Article 10 of the Mental Hygiene

Law.  She also has primary responsibility for communicating and interacting with New York

State's Office of Mental Health ("OMH") on issues that intersect with parole release, such as

provision of mental health treatment and programming to released parolees.  DOCCS and OMH

are the "State Agencies."

19. Flynn also worked with Regional Director Frank Gemmati ("Gemmati"), who

is DOCCS' Regional Director for the Hudson Valley, and is a regional supervisor for DOCCS' SOMU, as well as for general parole department supervision and policies in the region, including release of prisoners to parole in Orange, Sullivan, Dutchess, and Westchester Counties.

20. In early September 2016, Flynn learned from supervisor Kopp-Adams that DOCCS had proposed a prepratory investigative discharge plan for a John Doe ("Doe") to be released to the Liberty, New York area.  Flynn made substantial recommendations to investigate and improve that plan, before submission for approval by a State Court Judge.  Kopp-Adams assigned Flynn primary responsibility for arranging Doe's release and coordination with OMH – OMH had primary responsibility for arranging residence and treatment plans and planning for his release.

21. Indeed, as part of her regular duties in her Special Assignment, Flynn also has regularly worked with OMH's Division of Forensic Services, which administers SIST.  It was standard practice for a DOCCS SIST Parole Officer to work with OMH in the planning and delivery of SIST to those sex-offenders released to the community.

## The Court Order and the Statutory Framework

22. On September 29, 2016, Hon. Mary M. Farley of the St. Lawrence Supreme Court ordered DOCCS to plan for the release of Doe by October 20, 2016.  The Court Ordered, pursuant to M.H.L. §§ 10.03 (r) and 10.11, that Doe "is a sex offender requiring strict and intensive supervision [SIST]."  In its Conclusions of Law, it held that "Respondent shall be released to a regimen of SIST" and be subject to supervision requirements contained in the attached Conditions of Strict and Intensive Supervision and Treatment.

23. In those attached Conditions, the Court ordered and required ninety-four (94)

specific mandatory conditions applied to Doe as conditions of release and supervision pursuant to M.H.L. §10.11:  Such constituted an Order of the Court subjecting Doe "to the lawful conditions set by this Court"….and "a regimen of strict and intensive supervision and treatment pursuant to Article 10 of the N.Y.S. Mental Hygiene Law…."

      24. That statute, M.H.L. § 10.11, is entitled "Regimen of strict and intensive supervision and treatment."  M.H.L §10.11 (a) (2) states in relevant part that before issuing an Order containing the conditions of an offender's release, it will consider "submissions by the respondent and the attorney general concerning the proposed conditions of the regimen of strict and intensive supervision and treatment."  M.H.L §10.11 (a) (2) goes on to specify:

> The court shall issue an order specifying the conditions of the regimen of strict and intensive supervision and treatment, which shall include specified supervision requirements and compliance with a specified course of treatment.  A written statement of the conditions of the regimen of strict and intensive supervision and treatment shall be given to the respondent and to his or her counsel, any designated service providers or treating professionals, the commissioner, the attorney general and the supervising parole officer….

> The court shall require the department of corrections and community supervision to take appropriate actions to implement the supervision plan and *assure compliance with the conditions of the regimen of strict and intensive supervision* and treatment.

§ 10.11 (c) reads in relevant part: "A person ordered to undergo a regimen of strict and intensive supervision and treatment pursuant to this article is subject to lawful conditions set by the court and the department of corrections and community supervision".

      25. In addition, M.H.L. § 10.11 (d) (1) notes circumstances for revoking the release and intensive supervision:

> A person's regimen of strict and intensive supervision and treatment may be revoked if such a person violates a condition of strict and intensive supervision. If a parole

officer has reasonable cause to believe that the person has
violated a condition of the regimen of strict and intensive
supervision and treatment or, if there is an oral or written
evaluation or report by a treating professional indicating that
the person may be a dangerous sex offender requiring
confinement…. may take them into custody.

26. In preparation for the Court's implementation of this order, Flynn participated

in meetings and correspondence regarding the proposed SIST plan, even before the Court entered

its Order of September 29, 2016.   That included email correspondence on September 16, 2016

that Flynn sent to DOCCS supervisors and other emails where Flynn detailed significant

weaknesses in the proposed supervision and the lack of a true regimen:

A. Flynn learned from OMH in early September that Sullivan County had
refused to provide mental health, sex offenders or drug treatment
programming for Doe, even though he was a lifelong resident.

B. OMH referred Doe to Catholic Charities in Newburgh for opioid use disorder,
ecstasy and alcohol use disorder, among other issues.  Doe described himself
as a chronic heroin, ecstasy, and crystal meth addict.  Flynn noted that
Catholic Charities did not provide intensive outpatient services.  Further, other
programs had rejected him for treatment.

C. OMH's SIST liaison referred Doe to Options Counseling in Newburgh for sex
offender treatment related to his diagnosis of pedophiliac disorder and
schizoaffective disorder.  Flynn noted her "grave concern" that the treatment
was located in a densely populated residential area, and that Doe would have
to wait for substantial periods to get a ride to travel 60 miles between Sullivan
and Orange Counties.  In her September 16 and October 14 emails, Flynn also
observed that offenders disperse and stroll, or congregate and mill around the
road waiting for medical transport drivers to pick them up after their
appointments.  Flynn informed the OMH SIST liaison that a local school was
in close proximity to the Options location.  In an October 12 follow-up email
to her superiors, Flynn reminded them about the location challenges presented
by the Options Counseling location and noted that several "concerns noted in
the SIST report have yet to be addressed."  This case will require intensive
supervision as Doe presents *as the highest risk offender* I have been assigned
to supervise."

8

D. Further, in her September 23, 2016 draft report to the Court Flynn noted that there "is concern" about Doe attending sex offender counseling at the Options Counseling in Newburgh as "it is located in an area densely populated with families and children."

E. Further, OMH modified the plan for Doe to attend drug treatment in Newburgh, New York, as well as aversive therapy treatment at the same location in Newburgh. Throughout September, Flynn complained to OMH and her boss that this was a faulty plan, because the entrance to the drug treatment center and the mental health center was in the same building and less than fifty feet away from the Human Resources Administration office that provides social services to children at 280 Broadway in Newburgh, New York.

F. OMH planned to release Doe to a motel in Liberty, Sullivan County, New York. Flynn notified DOCCS officers that she had visited the XXX motel in Liberty, and learned that Sullivan County was paying the motel's owner to lodge seven sex offenders, and the owner acknowledged that he frequently rented rooms to travelers with children.

G. In her September 23 draft report to the Court, Flynn also sounded the alarm about Doe's willingness to cooperate with strict supervision and wrote, "It is significant to highlight that just about four months ago, on 5/27/16 Doe REFUSED to participate in the Forensic Evaluation that is required for this upcoming SIST hearing." In a later October 16 email, she noted that Doe "does not appear amenable to supervision as he indicated he will have problems if it is too restrictive."

H. In all, in an email of September 16, 2016, Flynn warned that it "takes team effort and close collaboration with OMH to avoid the pitfalls whereby this case can erupt into another media sensation...." On October 17, she warned that Doe's "case requires a collaborative effort by all agencies to formulate a cohesive release plan to meet the specific needs Doe presents." The day before, she had written her supervisors that this "was not a case where all agencies worked in a collaborative manner to develop a cohesive program for Doe that would best……ensure the community at large was protected."

I. Flynn also noted that Doe faced additional problems in being assigned to living in a motel because he is a moderately developmentally disabled individual and managing daily activity skills, shopping, looking, and transportation posed great challenges. Such added duties and pressures undermined a more comfortable adjustment to living in the community after incarceration.

9

27. Within an hour of Flynn's conversation with an OMH liaison about Doe's treatment plan and discussing many of these concerns, Senior Parole Officer Bill Meyers from DOCCS' Sexual Offender Management Unit, telephoned and told her to "stand down" and allow OMH more time to develop a plan.

**Events in October 2016 and the Request to Delay the Release of Doe**

28. After the Court ordered a specific regimen of intensive supervision on September 29, 2016, Flynn attended a meeting on October 13, 2016 to review the court-ordered regimen and make sure the regimen was indeed sufficiently "strict" and "intensive" as required by the Court's requirements and M.H.L §10.11 (a) (2)'s strictures.

29. In an October 14 email to her superiors regarding that October 13 meeting, Flynn wrote: "I mentioned in my SIST Investigation *grave concerns regarding community safety issues* as the sex offender treatment program at Options Counseling that [Doe] has been referred to is located in a densely populated residential area…."  Further, her email started: "At this time, due to the fact that the above captioned *has no viable release program in place*, we are requesting that the Court consider postponing [Doe's} release" scheduled for next week (*emphasis supplied*)."

30. Further, Flynn also complained verbally and in that same email to Kopp-Adams and her supervisors about this plan, stating that surrounding Doe with other sex-offenders at the Liberty motel location would exacerbate his sexual impulses and desire to repeat sexual behavior to children.

31. She explained that there was "no viable release program in place" as follows:

> He [Doe] is receiving mental health services from RPC, to include monthly injections to address his hyper sexuality.  There are serious community safety issues surrounding the release of the predicate felony

10

sexual predator of children to the community that has a well-established history of non-compliance with supervision and treatment mandates. There are also ethical issues that arise by releasing this significantly intellectually impaired individual that has faced a lifetime of chronic mental health issues and substance abuser problems without benefit of case management services to help him with the most mundane daily activity skills to include managing finances, shopping for food, cooking meals ect…[sic]

32. These statements, among others, referenced a lack of compliance with M.H.L §10.11 (a) (2)'s strictures and the Court's requiring (through its Order) the "department of corrections and community supervision to take appropriate actions to implement the supervision plan and assure compliance with the conditions of the regimen of strict and intensive supervision and treatment."  Flynn also clearly referred to community safety issues impacting the health and safety of the general public.

33. Further, ten days later, on October 24, 2016, Flynn forwarded the above email to DOCCS' Deputy Commissioner Ana Enright ("Enright"), and noted it as "[r]elevant to complaint" – referring to her complaint about OMH's lack of an integrated plan for Doe's release and a dispute with OMH.  She received no immediate response.  A few days before, Flynn also forwarded the October 14 email to Orange County's Forensic Coordinator for Orange County's Department of Mental Health Meghan Keener ("Keener"), in order to alert her about the specific plans for Doe's planned use of services and release into the Newburgh community. Flynn did so because she believed that Orange County's responsible administrators required that information to best protect their public, and they had not received reasonable notice about the plan.

34. Accordingly, and in light of these issues raised again with her supervisors at

DOCCS, OMH, and Orange County Department of Social Services, on or about October 14, 2016, Flynn requested that DOCCS petition the court for a brief postponement of Doe's planned release six days later.  DOCCS did not make such a request.

### Doe's Release and the Complaints About the Dangers He Posed

35. On October 20, 2016, Flynn supervised Doe's release in Sullivan County. Flynn informed Supervisor Paul Pacheco ("Pacheco") that shortly after his release from St. Lawrence Psychiatric Facility, Doe encountered a crying baby at Sullivan County Department of Social Services.  He admitted to fantasizing about forcibly, sexually abusing the small child. Flynn notified her superiors and also notified Kopp-Adams of Doe's repeated sexual arousal on October 25.

36. Further, on October 24, 2016, Flynn wrote and complained that OMH's top liaison Director had dismissed Flynn's safety concerns about the location of the Newburgh program sites and the proximity to children (during a meeting several days earlier on October 20).  The OMH official reprimanded Flynn for her concerns and explained that Doe wasn't a severe predator that "snatched" children off the street.  Flynn reiterated in the email that Doe was "an extremely high risk candidate to recidivate….and that she was not confident "that the community at large is safe under any circumstances."  Flynn again noted that referrals for Doe's treatment at the 280 Broadway site location in Newburgh

> were problematic, as this is the main county building used in the City of Newburgh by the Department of Social Services.  All agencies located at this site, primarily cater to the needs of families with children.  Of further concern, a local elementary school is located less than 500 feet away from this county building, and the *local law enforcement agency voiced community safety issues* that this high risk out-of-county resident presented.

Flynn noted an additional developing concern regarding securing treatment: "The release plan continued to unravel, as OMH discovered that no bus or train service were available to transport Doe the 60 miles he would have to travel to attend programming in Orange County."

37. At the October 20 meeting and in the October 24 email again, Flynn voiced concern about Doe's ability to function at a motel with other sex offenders and without appropriate support. OMH objected that "the subject could manage quite well until his food stamp award was activated, because he was in possession of a $100 in cash and had a $600 check." Given his significant developmental disabilities and the significant stressors and obstacles adversely affecting his functioning, Flynn believed it was inhumane to release him without more guidance and support. OMH's statewide Director of Office of Mental Hygiene's Sex Offender Program, Julie Pasquini, objected and derided Flynn's concerns, stating that Flynn had impeded and interfered with Doe's release.

38. After the October 20 meeting, Flynn received a telephone call from Kopp-Adams, who told Flynn that she had angered OMH in speaking out about the lack of an effective treatment plan for Doe. She also informed Flynn that no one appreciated her expressing concern that the treatment of Doe was "inhumane."

39. Upon information and belief, Flynn on or about October 25, Flynn also Informed Pacheco and Kopp-Adams that Doe had consciously avoided using the more effective ammonia stimulant as part of his aversive therapy, because of its alcohol. Such increased risk behavior by Doe was non-compliant with the Court's order.

40. On October 25, 2016, Flynn also informed Kopp-Adams that the OMH release plan did not contain Doe's signature, where he attests and agrees to actively participate in the treatment that is identified in his plan. That signature is required pursuant to the Mental

Hygiene Law §11.1, in order to assure effective and meaningful treatment and protection of the public.

41. Further, Flynn informed Kopp-Adams that there were difficulties implementing Aversive Therapy because of the presence of alcohol in the used stimulant and its effect on monitoring.  Doe needed that stimulant when he became stressed multiple times a day with thoughts of having sex with children and babies he met in the community.

42. On October 25, 2016, the Newburgh Mental Health and Catholic Charities Clinic Director Meg Duffy telephoned Flynn and explained that she had concerns about Doe because of the way he had described following a 13 year-old girl around a Shop-Rite.  Flynn then wrote that the treatment providers "are of the opinion that the subject would greatly benefit, if he was afforded *a more structured and supportive arrangement*."  She requested "assistance" in addressing the problem.

44. After meeting Doe again the next day, the warnings became more dire.  The treating psychiatrist, Dr. Tabassum Khan ("Khan") of the Newburgh Mental Health Clinic, telephoned Flynn and described Doe as a "ticking time bomb" and that it wasn't a matter of "if" but "when" he reoffends.  She also told Flynn that Doe was "euphoric" on his release, and that the current situation was "very dangerous." She asked Flynn's assistance and also mentioned that she had heard that Flynn was an "excellent" PO.

45.  That day, Flynn drove to the Peekskill Office and spoke with Pacheco, and told him about Khan's statement.  Pacheco countered that he would speak with Albany, but that Flynn should *not put in writing* Khan's concern that Doe was a "ticking time bomb" or very dangerous.  Pacheco told Flynn to have Khan write a letter with her concerns.

46. Flynn nevertheless precisely did put those "time bomb" concerns in writing

14

that same day (Oct. 26), in an email to Pacheco, Gemmati, and other DOCCS officials in Albany. Notably, she again included Enright, whom was not part of Flynn's normal reporting protocol. Flynn reported that Khan **"**evaluated Doe as a *high risk to sexually reoffend* at this time" and noted that he is very "hyper-sexualized" and stimulated by violence.  Flynn also reported an incident Khan had mentioned where Doe had followed a 13-year-old girl around a Shop-Rite store, that he was fixated on her because she had a "beautiful ass," and that his aversive therapy protocol had not helped him.  And Flynn reported Khan's conclusion that the current situation was "very dangerous."

47. Further, Flynn reported Khan's view that Doe had "actually been set up to fail."  Khan's view was that Doe "does *not currently have an adequate community release plan* in place that *meets his needs on any level*."  By contrast, Flynn reported that Khan had told her that it was "'critical'" that Doe be "afforded a *higher level* of supportive housing and more intensive programming."  Flynn reported Khan's view that the case "require[ed] the highest level of intensive supervision and treatment."  Thus, Flynn again reported a failure to comply with M.H.L. §10.11 (a) (2) and its strictures on intensive supervision, as well as grave effects on public safety, and did so after being instructed not to do so in writing.

48. Indeed, a few days later on October 28, Khan herself wrote and confirmed to DOCCS that Doe was living in a motel "with insufficient residential and group services for his continuous sexual urges.  He has very little structure during the day."

49. Further, Flynn reported on the afternoon of October 28, that the treaters at Newburgh Mental Health Clinic were alarmed when they learned of "more descriptive and disturbing details" that Doe was having that morning about a crying 4-year old.  Khan told Flynn that Doe was "too dangerous" to remain in the community, and that she would take immediate action to further alert DOCCS.  A few days later Khan reiterated in writing Doe's sexual

15

fantasies in arousal, and pursuits of young girls.   Khan also reported to DOCCS Doe's confessed thoughts of putting his hands on the crying child's mouth, raping her, and giving her "something to cry about."

### Defendant's Retaliatory Removal of Flynn from her Special Assignment Position

50.     Flynn's complaints about safety regarding the place of treatment, residence, and travel, as referred to in **¶¶ 20, 26, and 29-47, r**eferred to violations of the Mental Hygiene Law, as well as of Judge Farley's Order.  Specifically, Mental Hygiene Law Section refers to the requirement for "a regimen of strict and intensive supervision" of a designated sexual offender: Everything about the treatment, residence, travel, aversive therapy implementation and proximity to young children violated that provision, and Flynn over and over addressed those violations.

51. In addition, Doe also violated the Court's Order: that Order required Doe's participation in the treatment, proper use of aversive therapy, a regimen of strict and intensive supervision ("SIST") and monitoring of Doe's functioning, in order to assure the public's safety.

52. The complaints Flynn made about residence, places of treatment, and travel all presented serious dangers to the public safety and well-being of minors (especially young girls) residing in Newburgh and Liberty, New York.   Her complaints by email on October 24, 25, and 26, 2016 were particularly sharp regarding the complete lack of required SIST.

53. Instead of adhering and considering Flynn's complaining about essential safety, court-ordered, and statutory requirements affecting the public's safety, DOCCS instead punished Flynn.  On the early morning of October 28, 2016, Peekskill Bureau Chief Pacheco telephoned and told Flynn to appear for a 9 a.m. meeting with him only a few hours later.  There, Gemmati, in the presence of Pacheco and Supervisor Jenny Armstrong, announced that DOCCS

was relieving Flynn from her Special Assignment in the Sex Offenders' Unit, and that she was to

have no further responsibility for sex offenders as of that moment.  Gemmati handed her a memo

titled "Transfer" stating she had been "*released* from your Special Assignment case load" and

was returning to a "non-specialized caseload in Peekskill" effective immediately.  Gemmati also

directed that going forward, she was no longer to work with sex offenders in any capacity.

54. When Flynn asked the reason for her removal, Gemmati only explained that

she had not "maintained a collaborative relationship" with SIST team members, and elaborated:

"you don't play nicely in the sandbox".  Flynn was shocked and left.

55. Later that same day, Khan telephoned Flynn and told her that Doe had again

confessed to her about currently wanting to put his hands over a child's mouth, and then assault

her: Khan believed that Doe was "too dangerous" to be in the community and at imminent risk of

engaging in sexual conduct with a child and violating his parole.

56. Flynn was no longer assigned to the Sex Offenders' Unit when Khan

reported such to her.  Indeed, Kopp-Adams informed Khan that Flynn could not respond to any

more treatment issues, because Flynn was now "confined" to her office.  Pacheco nevertheless

asked Flynn to draft a memo regarding the risks Doe posed, and the violations of his parole that

she had observed.   She did so, preparing a draft on Sunday, October 30, 2016 for submission.

57. On information and belief, only several days later on November 1, 2016,

DOCCS, through Kopp-Adams and other DOCCS officers, submitted a much edited and altered

report to Judge Farley reporting the incarceration of Doe due to his hyper-sexuality and the

danger he posed to the community.  However, DOCCS did not follow the accepted process

requiring Flynn to review and swear to the statement's accuracy in an Affidavit submitted to the

Office of the Attorney General: instead, DOCCS submitted its own edited version signed by

others.  (Such was further supported by information submitted by Drs. Khan and Mayer

documenting Doe's repeated fantasies about raping the 13-year-old with a "beautiful ass" that he

met at Shop-Rite and other girls he met in previous days).

58. Flynn's draft memo resulted in a substantially edited and limited final report

submitted by DOCCS administrators (such as Kopp-Adams and a PO co-worker) to the Judge

Farley of the Supreme Court regarding Doe's violations of parole and the potential danger he

posed to the public.  On or about November 1, 2016, DOCCS reported the incarceration of Doe.

59. Much of the draft (but not the final) incident report memo to the Court

referred to Doe's violations of specific rules entered by the Court as conditions of Strict

Intensive Supervision for Doe's release.  For example, Doe violated rule #13 of the Court Order

in reporting being aroused in response to a "baby crying" and the resultant excitement and

thoughts of violence jeopardized and threatened the safety and well-being of children present at

the Sullivan County DSS building in Liberty.  Doe violated rule #67 of the Order in refusing to

use the ammonia capsules and most effective Aversive therapy, when aroused.  Doe's recounting

of similar arousal and failure to use the most effective Aversive therapy when he encountered

and fantasized about a teenage girl at Shop-Rite violated these same rules in the Court Order.

60. Flynn's verbal and written warnings between mid-September and October

26, 2016 had also warned her supervisors about other violations of the Court Order's explicit

conditions for strict supervision, such as complying with psychiatric exams (#3), not residing

with or having contact with other sex offenders (#4), and having sustained interaction with a

young girl at Shop-Rite who he described as having a "beautiful ass."  (#37).  Flynn had alerted

her superiors about these issue and violations of the Court's Order, and the danger posed to the

general public.

61. Ultimately, however, DOCCS omitted many of these charges from the final Incident Report submitted to the Court.  In fact, DOCCS engaged in a course of action to ignore most of the violations previously raised by Flynn – part of the group of concerns Flynn repeated had raised that motivated DOCCS' removal of her from the Special Assignment position.

62. In essence, DOCCS's final report excised completely Flynn's involvement in the case before October 28, 2016 – deleting reference to any violations that took place while she was the responsible PO and then removing her and another PO as the submitting authors. DOCCS chose to "delete" Flynn completely from the true and full events – all at the risk of undermining the factual support necessary to sustain Doe's incarceration.

63. Further, upon information and belief, the removal of these significant violations from Flynn's draft resulted in the Court's eventual decision to release Doe back to the community on approximately April 3, 2017: DOCCS could not substantially support Doe's incarceration once it chose limited, watered-down, and edited charges and violations.

64. Thus, DOCCS persisted in a course of conduct that may fundamentally harm the public's safety – all to "double down" on its course of ignoring and minimizing the nature of Flynn's complaints and her identification of violations, after its retaliation against Flynn.

65. None of that, however, has stopped Flynn from attempting to preserve her career and livelihood.  On February 14, 2017, Flynn filed a Stage I grievance, challenging her removal from the SIST Special Assignment and the resulting loss of overtime income.  She also complained later in 2017 about being precluded from any temporary assignments to transport sex-offenders when that work becomes available, as a means of earning some additional overtime.

66. On June 27, 2017, defendant issued its "agency level decision" denying plaintiff's Step II grievance challenging her loss of the Special Assignment, following a hearing conducted on June 9, 2017.  In its written denial, defendant's Labor Relations representative ratified defendant's Step I finding that there was "no contractual right to a specific case load" and that Flynn could be denied a SIST position and overtime in the "discretion of the appointing authority." The representative concluded that "Management acted appropriately" and there were no violations of the Articles of the agreement.

67. Further, the original grievance form states that a denial at Step II can only be appealed to Step III or to arbitration at Step IV by the President of the PEF bargaining group, clearly denying Flynn any individual right to arbitration.  Flynn was not required to submit a grievance as an exclusive remedy, since under §75-b(3)(b), nor could such end her right to bring an action here since Flynn is not "subject to a collectively negotiated agreement which contains….. a *final and binding arbitration* provision…." to "resolve" violations.

68. As such, Flynn followed the grievance process in challenging the denial of overtime, and her removal from the SIST position.  Flynn had no right to a binding resolution through an arbitration proceeding, and she started and exhausted her administrative remedies through the collective bargaining process.  She retains only rights under the Civil Service Law to challenge the unlawful denial of the SIST position and the overtime wages that always came from it.  She did so by filing her original complaint invoking, in part, the Civil Service Law, in federal court on April 20, 2017, and an Amended Complaint on August 18, 2017.

69. In addition, during 2017 and 2018, defendant has continued its acts of retaliation against Flynn, in denying her employment opportunities, promotions, and an improvement of her livelihood.  In or about January 2018, Flynn applied for a PRS position in

Manhattan, and she scored a 95 on the eligibility test. Its compensation is substantially higher

than that plaintiff receives as a PO.  Defendant nevertheless chose a lesser qualified individual

for the position, who had received a substantially lower test score.  Flynn was highly qualified

for such position, as she had received one of the highest scores on the qualifying exam.

Nevertheless, defendant denied her application, following its interview of plaintiff in a far-away

and inappropriate location.  Earlier, in or about October 26, 2017, Flynn had applied for a sex

offender position after her former partner, Jose Pabon, left that position to take a training

position.  Defendant refused to even grant her an interview for the position, and on December 4,

2017, she grieved that decision to deny her an interview and the position, affording work that she

loved and that compensated her at a substantially higher rate than her PO position.  Defendant

denied that grievance, also stating that such was non-contractual, and could not be appealed by

her to Stage III.

       70. As described above**,** Flynn had complained of numerous deficiencies in

DOCCS' treatment plan to Kopp-Adams, Gemmati and other DOCCS officers, and violations of

the requirement under § 10.13(a)(2) that the Court will "require the department of corrections

and community supervision to take appropriate actions to implement the supervision plan and

assure compliance with the conditions of the regimen of strict and intensive supervision and

treatment **…..**"  DOCCS and OMH had failed to take "appropriate actions to implement the

supervision plan and assure compliance with the conditions of the regimen of strict and intensive

supervision…." and Flynn had complained to her supervisors about these deficiencies. Similarly,

§10.11(c) specifies that a person "ordered to undergo a regimen of strict and intensive

supervision and treatment….is subject to lawful conditions set by the court and the department of

corrections and community supervision."  Flynn identified violations by Doe of the SIST

conditions – as mandated by statute – and of the specifics of the Court's "specified supervision requirements and compliance with a   specified course of treatment." She thus complained about violations of state law and a court order threatening and posing a hazard to the health and safety of the public-at-large in Orange and Sullivan counties

### Summary of Retaliatory Action and the Threat to Public Safety

71. DOCCS', Kopp-Adams', and Gemmati's action in removing Flynn from her Special Assignment working with sex-offenders has harmed the health and safety of the public in the surrounding counties, including Orange, Sullivan, and Duchess Counties.  Indeed, Daniel Cameron, the Chief of Police for the City of Newburgh, wrote Pacheco and commended Flynn's work with "our sex offender population."  He explained the "significant assistance" that Flynn had provided in updating the City's procedures in consultation with Flynn and DOCCS, and explained that to "succeed we need to successfully collaborate together.  I feel that the removal of Officer Flynn has directly affected that collaborative effort." He asked for an opportunity to further express his "concern over the personnel change."

72. Similarly, treaters of sexual offenders in the community wrote and praised Flynn's input and efforts in participating in clinical functions and development of treatment plans.  Maria Messerschmitt of Cornerstone Family Healthcare in Newburgh stated that Flynn's "input is very valuable to our staff."  She expressed her "great disappointment" that Flynn was no longer overseeing the sex-offender population, and noted that Flynn "has always made herself available to our team no matter what time of the day it was."  She complimented Flynn's concern and effort for her clients and summarized: "Honestly, I don't think Rita ever slept a full night worrying about the needs of her clients."

73. Defendant's entire course of conduct -- their instructions to Flynn in

September to "stand down" when she expressed concern about the inadequacy of Doe's treatment plan, the telephone call she received from Kopp-Adams after October 20 stating that Flynn had angered OMH and shouldn't have spoken about the treatment plan being "inhumane", their warning that Flynn should not put information about Doe's imminent danger in writing, and their ultimate conclusion that she didn't "play nice in the sandbox" -- demonstrates their concerted effort to silence and stop Flynn:  every step of the way, Defendant sought to silence Flynn's advocacy about imminent safety concerns and treatment deficiencies.  In doing so, and in then removing her from the Special Assignment, Defendant retaliated against Flynn for complaining about breaking laws and regulations integral to protecting the public's safety, as well as the safety and civil rights of the released sex offender.

74. Specifically, when Flynn reported in writing (over DOCCS' objection and instruction) that OMH and DOCCS must afford a higher level of supportive housing and intensive programming, when Flynn reported that the proposed treatment locations and local schools, when she reported about the dangers of residing without supervision in the Liberty motel, when she discussed the risks of travel and roaming the streets of Newburgh, Flynn complained of violations of §10.11 and of the Court's September 29, 2016 Order.  The inadequacy of those services and their failure in detail and operation to comply with the strict and intensive supervision necessary for the public's safety – as raised repeatedly by Flynn -- violated the Court's Order and the Mental Hygiene Law.

75. Further, Flynn reported violations of §10.11 when she reported the inability and unwillingness of Doe to use the most effective tools of Aversive Therapy.  She reported Doe's failure even to agree in writing to a course of cooperative treatment conduct, as required by the Court's Order.  Most essentially, Flynn reported his repeated fantasies about

engaging in sexual contact with young children and the repeated triggers and impulses he experienced when seeing or thinking of young children.

76.     Flynn continued to endure numerous episodes of continued and ongoing retaliation in 2018 and the start of 2019, and a brief summary of the more egregious continued harassment and creation of a hostile environment are detailed below.  Now the additional retaliation concerned further limits on her income and ability or entitlement to overtime at many junctures, but in in late 2018 intensified further as ongoing retaliatory harassment and a hostile environment.  Defendant rather has focused on creating a calculated and continuing pervasive hostile environment targeting Flynn for newly manufactured, harsh and ridiculous work expectations, designed to make her life miserable and intolerable at work.  Such retaliatory environment is continuing and designed to make Flynn "take" her retirement from DOCCS and to effectuate a "constructive" discharge of Flynn's employment.  Such would also cause a resulting loss in income and earnings.

77.     For example, plaintiff's direct supervisor Pacheco has continued throughout 2017 and 2018 to refuse to allow plaintiff to work any overtime hours, whenever such may become available while in the middle of exercising her duties with a parolee.  Then, when Flynn participated in an approved special operations in serving a "no-knock" warrant, with approval to work more than six overtime hours on October 19, 2018, Pacheco repeatedly reprimanded Flynn and disciplined her in the fall of 2018 for having submitted such hours, accusing her of approximately submitting such overtime hours and formally disciplining her, resulting in a grievance.  Clearly, under applicable labor laws and the CBA, plaintiff had every right to submit and be paid for actual overtime hours worked that had been approved and authorized, as opposed to punished and retaliated against for having requested that she be paid

for special operations work authorized and performed.  But that is not good enough for Pacheco

nor defendant's retaliatory plans and in its effort to perpetuate the hostile environment, it instead

disciplined Flynn.  In doing so, defendant transparently treated Flynn differently than other

Parole officers who are forced by events to work overtime hours and then claim rightful pay for

work; defendant, through Pacheco and other officers, continues to act as part of its pattern of

creating a clearly retaliatory environment, niggling about the appropriateness of overtime

claimed in order to create and inflame retaliatory conflict and discipline.

        78.    Defendant has escalated its creation of an ongoing retaliatory environment

in myriad ways:  in the fall of 2018 and since then, Pacheco has continued the retaliatory attacks

on plaintiff through disciplining her for failing to write and submit reports while she was on

medical leave for an eye condition, and generally criticizing and harassing her for not submitting

paperwork and reports properly, and on what Pacheco deemed a timely basis.  Such criticisms

were only harassing and pretextual, as even while Pacheco repeatedly disciplined Flynn and

referred her for investigation, especially when she was on medical leave, and in a complete and

senseless departure in how Pacheco treated other staff members regarding deadlines and

accomplishments:  Pacheco and DOCCS did not treat other parole officers who had not made

complaints about safety and lack of due care to prevent molestation of children in a way that

even  remotely resembles the way Pacheco has attacked and criticized Flynn.

        79.    For Flynn, especially during 2018, Pacheco has manufactured

performance issues, criticized her every word with a client while other Parole officers engage in

grave mistakes and misconduct, and then expected Flynn to submit written casework and interact

with clients while on medical and personal leave.  Pacheco also permitted a male co-worker to

verbally abuse Flynn when he disagreed with her, without either stopping or assessing the

intimidating actions and behavior of the male officer.  Instead, Flynn filed a grievance about the

treatment, and Pacheco exploded at her.  During this period, Pacheco also routinely criticized

Flynn and issued written reprimands to Flynn her for being derelict in submitting her timecard

information, her expense reports, and written reports on clients – all while encompassing periods

she had an eye surgery and was on medical and personal leave for almost two months between

December 2018 up until parts of February 2018.  Pacheco has thus treated Flynn in a much

harsher manner and with retaliatory harassment, subjected Flynn to manufactured performance

expectations, unreasonable and ridiculous expectations while she was on medical and other

leave, and generally engaged in a campaign to make Flynn's life miserable and drive her out of

employment so that she would take "retirement" from her employment.

80.     Flynn will not embrace a forced retirement pursuant to Pacheco's games

and manufactured written discipline.  This she cannot and will not do, as DOCCS cannot be

permitted to drive Flynn out through its well-worn campaign and organization of retaliatory

harassment.  Defendant's efforts to inflict pain on Flynn with discipline of "a hundred cuts" only

evidence its comprehensive retaliatory motive and efforts.

81.     Further, in late 2018 and after, defendant engaged in standing aside and

watching more significant real physical blows to Flynn's head and knees, while initially taking

no action against the attacking parolee or registering an investigation to protect its parole officer

- plaintiff Rita Flynn.  Defendant's animus is obvious, outrageous in even permitting physical

violence, and it must cease its egregious conduct.

*82.*     In late November 2018, a parolee being physically detained with an ankle

shackle and handcuffs shot her knee into Flynn's head while Flynn attempted to secure the

shackle, throwing Flynn's head back and causing injury from the shock of contact to Flynn's

upper back area.  First, Flynn's immediate Supervisor Lynn Johnson-Richardson ("Richardson") refused to even report the physical attack on a Parole Officer who served under her command, as is required under long-standing practice and protection of staff members from violence from parolees.  Rather, defendant, Richardson, and Pacheco were completely satisfied to ignore and essentially allow Flynn to be injured by a Parolee *with no punishment or even record made whatsoever against the Parolee for assaulting an officer while that officer conducted her job duties for the State.  Hurt with a head injury, she had to take care of her own transportation to the hospital.*

83.     This blatant attempt to first cover-up and ignore a physical attack on Flynn, a parole officer, by a Parolee in the process of being "detained" or "apprehended" for re-arrest is outrageous in its disregard for Flynn, her physical protection, and the typical process and precedent for the essential protection of Parole officers.  If parole officers are not physically protected from physical harm, Pacheco and defendant know that the very work cannot be performed and DOCCS cannot function.  They know that protection of officers is essential to the very functioning of DOCCS and parole work.

84.     Nevertheless, Pacheco and Richardson and defendant together did not even care that plaintiff had been assaulted and needed to visit the Hospital to assure her safety and functioning.  They did not begin to prepare a report of the attack or launch an investigation, until many days later at Flynn's request when she saw there was no plan to investigate nor discipline the parolee who attacked her**.**  In fact, Richardson, the supervisor and Commanding Officer then on duty, actually instructed another officer to not even write up the violent incident, departing radically from practice to immediately report such offenders and memorialize violent attacks on officers.  Further, no fellow officer  - let alone her Commanding Officer Richardson –

drove her to the emergency room; Flynn had to drive herself there, even though injured and hurt in the head.

85.     Obviously, the typical practice or procedure after any injury or attack is that someone will drive the injured officer to the hospital; nevertheless, Richardson radically departed from mandated procedure in forcing Flynn to drive herself to the hospital, even though injured.  Richardson only showed up at the hospital to do a cosmetic "check-in" on Flynn's health and concussion status.

86.     Later, when it became clear that defendant had to respond to an incident report and written information submitted by plaintiff, Pacheco and Richardson in December 2018 shifted to harassing Flynn about the speed of her own descriptions and report details, after she had already submitted one written version of the events.  Instead, Flynn's supervisors now insisted that she re-submit more and identical information in report form, even while Flynn was not working during a period in December and January when she was on a medical leave for eye surgery, or on personal leave.

87.     Whether turning a blind eye to actual physical violence and allowing such on Flynn by parolees without report or consequence, or then deriding and pressuring Flynn for constant submission of time records, updated and revised incident reports, work reports, etc, -- all during periods of time when she was on leave for surgery or taking personal days off – defendant has escalated its program and "refined" its practice of retaliatory harassment, operating primarily through Pacheco and Richardson.

88.      Enough.  Defendant will not prevail in forcing or compelling Flynn to lose more income and "take" a retirement from DOCCS, while simultaneously severely reducing her livelihood.  Defendant, Pacheco, Richardson should be enjoined by this Court from taking

any such further action and discipline while plaintiff has returned from her surgery and leave

period in early April 2019.  Escalated and supposedly more "precise" retaliatory harassment

violates the Civil Service Law and should be enjoined and stopped by this Court.

89.     Nor may defendant be permitted to engage in a widespread pattern of

retaliatory harassment, manufacturing of job duties, and pretextual criticisms of her submissions

while on medical leave in order to try to force Flynn's resignation.  Defendant should be

prohibited from engaging in a pattern of behavior designed to constructively discharge Flynn.

90. Further, defendant has now been subjected to an investigation by the

Office of State Investigations, in reviewing its treatment of Flynn and whether such complies

with the State's internal policies and appropriate practices on the payment of overtime hours, the

internal investigation and review of violence against a parole officer (Flynn), and its treatment in

repeatedly disciplining Flynn for manufactured infractions, including not completing her work

while she was on medical and personal leave at the end of 2018 and the first six to seven weeks

of 2019.  Further, Pacheco has even seized on the OSI investigation itself, accusing Flynn

erroneously of using "clocked-in" time to prepare and submit materials and responses to the OSI

as part of its investigation.  This she has not done, and defendant grasps at straws to now create

some new level of manufactured criticism and harassment of Flynn, clutching for new

allegations that she is not performing her job duties.

91. Defendant's conduct in removing Flynn from the SIST position in October

2016, in refusing her requests to apply for that vacancy position in October 2017, and in denying

her request for the PRS position in January 2018, and the ongoing harassment regarding Flynn's

submission of paperwork documentation, overtime hours, and the utter failure to report violence

against Flynn in any report, are all continuing acts of retaliation and retaliatory harassment in
violation of the Civil Service Law.

WHEREFORE, plaintiff RITA FLYNN avers the following causes of action
against the Defendant, and requests the foregoing relief, as follows:

## CAUSE OF ACTION

### (Civil Service Law §75-b against defendant DOCCS)

92.  Plaintiff repeats and realleges paragraphs 1 through 91 of this Complaint
as if set forth herein.

93. Flynn engaged in a course of conduct of continued complaints about the
failure to enforce and implement conditions of the regimen of strict and intensive supervision as
required under §10.11(a)(2).

94. These complaints by Flynn about the failure to comply with the Mental
Hygiene Law directly related to protecting the public's health and safety – since, as specified in
the Court's Order and by treatment professionals, without the appropriate conditions and
implementation of supervision, Doe posed a serious risk to the health and safety of children.
Further, as specified by Flynn, Defendant's actions and lack of serious treatment and
implementation posed a serious risk of harm to Doe himself.  As Flynn quoted Khan two days
before Defendant demoted Flynn, Doe was a "ticking time bomb" that could explode and
seriously harm members of the public:  Flynn spoke out repeatedly to advocate preemptive
action to avoid such an explosion.

95. In the alternative and in light of all of the safety issues posed and raised by
Flynn, even if her complaints did not constitute a clear violation of §10.11(a)(2), Flynn had a
good faith belief that DOCCS had violated the SIST statute – which is the only showing required

by §725(b).

96. After several weeks of Flynn's complaints to her supervisors and DOCCS, and only days after her emails of October 24, 25, and 26, 2016, Defendant declared that she did not "play nice" in her complaints about the lack of treatment, and the serious potential harm on the public's health and safety. Accordingly, Defendant demoted Flynn and stripped her of her Special Assignment position and overtime compensation after she complained about lack of compliance with the law, and about the significant risk of harm to the public.

97. In retaliating against Flynn for her complaints about the potential for serious harm to the health and safety of the public from Doe if he was permitted to roam at large and be present near an elementary school, defendant DOCCS violated Labor Law §75-b (the "Civil Service Law").

98. As a result of Defendant's actions, Flynn is suffering financial hardship and a loss of substantial back pay earnings, from the substantial overtime she has typically earned in her Special Assignment position. Further, she requests injunctive and declaratory relief from defendant DOCCS, requiring that such defendant place Flynn back in her Special Assignment position, in the Sexual Offenders' Unit, where she has worked most of her career in the last fifteen years, and grant her the typical overtime pay that had been part and parcel of that position for many years. By reason of the foregoing, defendants are liable to Flynn for damages, including compensatory damages, costs and disbursements, the exact amount to be proven at trial, injunctive relief to stop all such harassment from continuing to date and beyond, and to attorneys' fees.

99. Defendant has also created a pattern of harassing behavior by Pacheco and Richardson, including turning a blind eye to violence against plaintiff, manufacturing complaints

about submission of overtime, reports during her medical and personal leaves, and routinely

retaliating against her and treating her far more harshly than other parole officers.  Suc h

includes criticizing her every submission, timecards, and use of language, in an attempt to make

her very uncomfortable and "convince" Flynn to abandon her more than twenty-five year career

and employment by resigning.

100. This she will not do and Flynn will not cooperate with defendant's effort to

constructively discharge Flynn from employment – even where defendant has done plenty to

make the working conditions and daily harassments intolerable.

101.  Defendant's unlawful retaliation, the loss of her Special Assignment

position and constant day-to-day harassment about her performance in the midst of a physical

attack by a parolee, has caused Flynn to suffer severe emotional harm.  Such has greatly

aggravated her anxiety and worry now as to her very physical safety, her livelihood and support

and professional standing in the law enforcement community.

102.    By reason of the foregoing, Defendant is liable to Flynn for damages,

including compensatory damages, costs and disbursements, the exact amount to be proven at

trial, and attorneys' fees. Plaintiff repeats and realleges paragraphs 1through 90 of this

Complaint as if set forth herein.

**WHEREFORE**, Plaintiff, Rita Flynn, demands judgment against Defendant

as follows:

> (a)    on the Cause of Action, an award of statutory damages, lost
> backpay, the exact amount to be proven at trial against Defendant;
> including, but not limited to, attorneys' fees, costs and
> disbursements incurred in connection with this action; and further
> injunctive relief as the Court may deem just, proper, and
> equitable, including reinstatement to her Special Assignment in
> the Sexual Offenders' Unit and the reinstatement of overtime
> compensation that comes with that position.  Such request also

includes, but is not limited to, an Order prohibiting defendant from any further retaliation against Flynn in her performance of her job duties, or expectations of submitting paperwork while on leave periods for surgery or personal reasons,  or in standing silent while she sustains physical violence at work from Parolees, promotion to positions she would have received absent defendant's retaliation.  Defendant should be prohibited from further actions designed to create intolerable conditions through its retaliatory harassment and prohibited from engaging in a retaliatory pattern of severe harassment designed to constructively discharge Flynn from her employment.

Dated: Goshen, New York
      April 29, 2019

                     FOULKE LAW FIRM

                     By:   *s/Michael Ranis, Esq.*
                        Michael Ranis, Esq.
                     Attorneys for Plaintiff
                     55 Main Street, 2nd Floor
                     Goshen, NY  10924
                     845-294-4308 (MBR #3757)